IN THE SUPREME COURT OF TENNESSEE

AT JACKSON

FILED

**November 9, 1998**

FOR PUBLICATION

**Cecil W. Crowson
Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | **Filed: November 9, 1998** |
| Appellee, | ) | |
| | ) | |
| | ) | SHELBY CRIMINAL |
| Vs. | ) | |
| | ) | HON. JOSEPH B. BROWN, JR., |
| | ) | JUDGE |
| KEVIN BURNS, | ) | |
| | ) | |
| Appellant. | ) | No. 02-S-01-9708-CR-00073 |

**For Appellant:**
Glenn I. Wright
WILSON & WRIGHT
Memphis, Tennessee

**For Appellee:**
John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Kenneth W. Rucker
Assistant Attorney General
Nashville, Tennessee

At Trial:
John W. Pierotti
District Attorney General

Thomas D. Henderson
John Wheeler Campbell
Assistant District Attorney Generals
Memphis, Tennessee

# O P I N I O N

AFFIRMED                                                    ANDERSON, C.J

The defendant, Kevin Burns, was convicted of two counts of felony murder and two counts of attempted felony murder. The jury imposed the death penalty for one of the felony murder convictions after finding that evidence of an aggravating factor -- that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered -- outweighed the evidence of mitigating factors beyond a reasonable doubt. The jury imposed a life sentence for the other felony murder conviction.

On direct appeal, the Court of Criminal Appeals affirmed the convictions and the sentences for the felony murder convictions, but reversed the attempted felony murder convictions. After the case was docketed as a death penalty appeal in this Court pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1997), we reviewed the Court of Criminal Appeals' decision, the record, and the applicable law, and we entered an order specifying three issues for oral argument.[1]

We have determined that none of the alleged errors claimed by the defendant affected the convictions for felony murder or the sentences imposed by the jury. We have further concluded that the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and this defendant. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.

## BACKGROUND

### Guilt Phase

On April 20, 1992, four young men, Damond Dawson, Tracey Johnson, Eric Thomas, and Tommie Blackman, were sitting in a car in Dawson's driveway in Memphis. Dawson was in the driver's seat, Johnson was in the front passenger seat, Thomas was in the back seat behind Dawson, and Blackman was in the back seat behind Johnson.

The defendant, Kevin Burns, and Carlito Adams, who knew Blackman, walked up to the passenger side of the car. Adams pulled out a handgun and told Blackman to get out of the car. When Blackman refused, Burns pulled out a handgun and went around to the driver's side of the car. Blackman got out of the car and fled. Adams said "get him," and three or four more men appeared from behind hedges and fired at Blackman.

Eric Jones, age fourteen, was playing basketball at Dawson's house with three friends. Jones saw the men in the car removing jewelry and pulling money from their pockets. Seconds later, Jones saw Blackman running toward him. Amidst gunshots, Jones and Blackman escaped to the back of the house; Jones' three friends ran to an adjacent yard. Once inside the house, Jones heard seven or eight more gunshots.

Mary Jones, Eric Jones' mother, lived across the street from the Dawsons. She saw Adams shoot Johnson once in the chest. She saw Kevin Burns shoot Dawson several times, walk to the front of the car, and then shoot Dawson again. Ms. Jones unequivocally identified Burns and stated that she got "a real good look in his face" as he ran toward her after the shootings.

Tracey Johnson died at the scene. Damond Dawson, who suffered five gunshots to his arm, buttocks, chest, and hip was alive when police arrived but died after being transported to the hospital. Eric Thomas, who sustained gunshots to his chest and stomach, survived and made a photo identification of Kevin Burns two days after the incident. Thomas testified that Burns and the others had "opened fire" after robbing him and his friends of their jewelry and money. Thomas said that he initially told police he had been shot by Adams, but explained that he believed he was going to die and gave police the only name he knew, which was Adams.

On June 23, 1992, Burns was found in Chicago and arrested. After being advised of his rights and signing a waiver, the defendant gave a statement in which he admitted his role in the killings. He said that he had received a telephone call from Kevin Shaw, who told him that four men had "jumped" Shaw's cousin. Burns, Shaw, and four others intended to fight the four men, and Shaw gave Burns a .32 caliber handgun. As the others approached a car with four men sitting in it, Burns stayed behind. He heard a shot, saw a man running across the yard, and fired three shots. He then left the scene with the other men.

After the guilt phase of the trial, the jury deliberated and returned verdicts of guilty for two counts of felony murder and two counts of attempted felony murder. The trial moved into the penalty phase of the proceedings for the jury to determine the punishment for each of the felony murder convictions.

**Penalty Phase**

Jonnie Dawson, mother of Damond Dawson, testified that Damond was the youngest of her three children and seventeen years of age when he was killed. She said he was a good son who was very good at athletics. The neighborhood had changed after the killings; people locked their doors and were afraid. Ms. Dawson testified that she no longer knew what it was like to be happy.

Brenda Hudson, mother of Tracey Johnson, testified that Tracey was the oldest of her three children and twenty years of age when he was killed. He had been working at Wal-Mart and saving money for his four-month-old daughter. Tracey's death had greatly affected Ms. Hudson' other two children, Tracey's grandfather, and Tracey's young daughter:

> When you go over to her house to see her, she has a picture in a frame and she will show you. She'll say, 'this is my father -- this is my daddy, Tracey. He lives in God's house up in heaven.' And it's hard for me to go see her a lot because it breaks my heart to hear her say that.

In mitigation, Leslie Burns, the defendant's mother, testified that the defendant was twenty-six years of age and had twelve brothers and sisters. He had graduated from high school and had presented no disciplinary problems while in school. The defendant's father, Reverend Obra Carter, testified that his son had always been obedient and well-mannered. Phillip Carter, the defendant's brother, testified that the defendant had been active in the church and had always tried to avoid trouble.

Norman McDonald, the defendant's Sunday School teacher, testified that he had known Kevin Burns for several years. According to McDonald, Burns was a "faithful" young man who had always attended church regularly. Mary Wilson, a Captain with the Shelby County Sheriff's Department, and Bennet Dean, a volunteer chaplain, both testified that Burns had actively participated in religious services while in custody for these offenses.

The prosecution relied on two aggravating circumstances to seek the death penalty for the felony murder convictions -- that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder, and that the murder had been committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the

defendant or another.  Tenn. Code Ann. § 39-13-204(i)(3) and (6) (1997 & Supp. 1998).

With regard to the felony murder of Damond Dawson, the jury imposed the death penalty after finding that the evidence supported the "great risk of death" aggravating circumstance and that this factor outweighed the evidence of mitigating factors beyond a reasonable doubt.  With regard to the felony murder of Tracey Johnson, the jury imposed a sentence of life imprisonment.

The trial court entered judgment in accordance with the jury's verdict.  The Court of Criminal Appeals affirmed the convictions and sentences for the offenses of felony murder, but reversed the convictions for attempted felony murder based on our opinion in State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996).[2]  After our review of the record and applicable authority, we affirm the Court of Criminal Appeals.

## AGGRAVATING CIRCUMSTANCE

The defendant argues that the Court of Criminal Appeals' reversal of the attempted felony murder convictions requires a finding that the evidence failed to support the single aggravating circumstance found by the jury -- that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered.  Tenn. Code Ann. § 39-13-204(i)(3).  The State maintains that the evidence overwhelmingly supported the jury's finding, notwithstanding the reversal of the attempted felony murders.

We begin by observing that the Court of Criminal Appeals properly reversed the attempted felony convictions.  In Kimbrough, supra, we noted that the statutes governing attempted crimes require a defendant to intend the commission of a

---

[2] The Court of Criminal Appeals remanded the cases to the trial court for possible retrial for attempted premeditated murder.

specific crime or result, while the offense of felony murder requires "a reckless killing of another" in the course of certain enumerated felonies. Tenn. Code Ann. §§ 39-12-101 (1997) & 39-13-202(a)(2) (1997 & Supp. 1998). Like nearly every jurisdiction that has addressed the issue, we concluded that the offense of attempted felony murder does not exist:

> [I]t is illogical that someone could intend to cause someone else's death through negligence or even recklessness. While one may reasonably conclude that a defendant intentionally behaved in a reckless manner and may have intended to kill the victim, it does not make sense to say that a defendant intended to kill the victim by being reckless.
>
> We conclude that one cannot intend to accomplish the unintended. Consequently, the offense of attempted felony-murder does not exist in Tennessee.

Kimbrough, 924 S.W.2d at 892.


Aggravating circumstance (i)(3) "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." State v. Cone, 665 S.W.2d 87, 95 (Tenn.), cert. denied, 467 U.S. 1210, 104 S. Ct. 2400, 81 L. Ed. 2d 357 (1984). It most often has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present. State v. McKay, 680 S.W.2d 447 (Tenn. 1984), cert. denied, 470 U.S. 1034, 105 S. Ct. 1412, 84 L. Ed. 2d 795 (1985) (defendants killed two victims during robbery and shot at and threatened two other persons inside store); State v. Workman, 667 S.W.2d 44 (Tenn.), cert. denied, 469 U.S. 873, 105 S. Ct. 226, 83 L. Ed. 2d 155 (1984) (during a shoot out with police, the defendant killed one officer, wounded a second, and narrowly missed a third); State v. Johnson, 632 S.W.2d 542 (Tenn.), cert. denied, 459 U.S. 882, 103 S. Ct. 183, 74 L. Ed. 2d 148 (1982) (three shot and injured inside store; two shot and killed in the parking lot as defendant fled).

The defendant's argument is that the prosecution relied upon the attempted felony murder convictions to establish this aggravating circumstance, and that the reversal of the convictions renders the aggravating circumstance inapplicable. The defendant cites the following excerpts from the prosecutor's closing argument:

> We haven't proven a risk of death to two or more people? My God, you've returned a verdict that he attempted to murder two other people. It is established, beyond a reasonable doubt, and already been found as a verdict that there was a risk of death to two or more people.
>
> . . . .
>
> So, how anybody can say those [the aggravators] weren't proven when the verdict proves one of them and going back and shooting him again proves the other.
>
> . . . .
>
> If you look at the evidence, you know the aggravating circumstances are there, and one of them has already been found.

The transcript reveals, however, that the above statements were made in the context of the prosecution's detailed argument as to the evidence which supported this aggravating circumstance. In its initial argument, for example, the prosecutor said:

> Now, what we're talking about is when Mr. Blackman was running from the car, Eric Jones was in the way of the shooting. Eric Jones confronted Tommie Blackman as he ran from the car and was caught in this gunfire. . . . But also there were three other young men playing basketball on the side of the yard. All three of those young men were also caught in the gunfire of the individual shooting at Tommie Blackman. That is risk of death or great bodily injury to persons other than the intended victims in this case. . . . In addition to Tommie Blackman, there were four persons that were in the line of fire. That is one of the aggravating factors. . . .

These points were reiterated in the prosecutor's rebuttal argument as well:

> There wasn't a risk of death to two or more people. How about . . . Eric Thomas who caught three rounds in his body fired not by one of [the] codefendants but by that man [defendant] right there. He shot him and shot him and shot him. That's a pretty good risk of death. How about Tommie Blackman who's running? There's a risk of death

-8-

to two people right there, not even counting the children playing basketball.

. . . .

He went with other armed men.  He robbed.  He shot and wounded an unarmed teenager.  He helped others shoot at and kill other unarmed teenagers.  With others, he shot in the direction of children playing basketball; and he personally shot two people repeatedly.

Of even greater significance, however, is that the evidence in this record overwhelmingly supports the prosecutor's argument and the jury's finding that the defendant knowingly created a great risk of death to two or more persons other than the victims murdered.  The defendant, while armed and acting in concert with others, approached a car containing four unarmed men.  The defendant fired his weapon inside the car where Dawson, Johnson, and Thomas were seated, killing Dawson and wounding Thomas.  He admitted firing shots at the fleeing Blackman, which, according to testimony, directly imperiled Eric Jones and the three individuals who were playing basketball in the Dawson's driveway.

Accordingly, the evidence overwhelmingly supports the prosecutor's argument and the jury's finding that the defendant knowingly created a great risk of death to two or more persons other than the victim during the act or murder.  The reversal of the attempted felony murder convictions, which under <u>Kimbrough</u> was predicated upon a matter of statutory law, does not affect the jury's finding regarding the aggravating circumstance.

## VICTIM IMPACT EVIDENCE

The defendant argues that the trial court erred in admitting testimony of the victims' mothers during the penalty phase of the trial and by allowing the prosecutor to emphasize this evidence during its closing argument.  The defendant contends that so-called "victim impact" evidence and argument is inflammatory, irrelevant to

the sentencing determination in a capital proceeding, inadmissible under our death penalty statutes, and violative of Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. The State maintains that the evidence is relevant and admissible in the penalty phase of a capital trial.

In State v. Nesbit, ___ S.W.2d ___ (Tenn. 1998), we recently held that victim impact evidence and argument is not per se improper under either statutory or constitutional law. Our analysis of the sentencing statutes began with Tenn. Code Ann. § 39-13-204(c), which states:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

(emphasis added).

This statute delineates a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. As we said in Nesbit, "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language 'nature and circumstances of the crime.'" ___ S.W.2d at ___. The statute, therefore, allows the sentencing jury to be reminded that "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss

-10-

to society and in particular to his family." Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720 (1991).[3]

We also, in Nesbit, recognized that the United States Supreme Court has held that Eighth Amendment to the United States Constitution does not constitute a per se bar to the admission of victim impact evidence and argument:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.

Nesbit, ___ S.W.2d at ____ (quoting Payne, 501 U.S. at 825, 111 S. Ct. at 2608). Our recent decisions have followed Payne and have held that victim impact evidence and argument is likewise not precluded by the Tennessee Constitution. E.g., Nesbit, ___ S.W.2d at ___.

Not all victim impact evidence and argument, however, is appropriate. It should be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." Id. at ___ (citing, Payne, 501 U.S. at 822, 111 S. Ct. at 2607) (footnote omitted).

Moreover, any evidence that threatens to render the trial fundamentally unfair or poses a risk of unfair prejudice may violate the due process provisions of the United States and Tennessee Constitutions and must be excluded. Id. The trial

_____

[3] In Nesbit, we also observed that State v. Cozzolino, 584 S.W.2d 765 (Tenn. 1979), in which this Court had said that evidence must be relevant to an aggravating circumstance or mitigating circumstance, had not been applied so as to preclude evidence that is relevant to the "nature and circumstances of the offense." ___ S.W.2d at ___. We also note that the legislature has since enacted 1998 Pub. Acts, ch. 916, which expressly allows the State to introduce victim impact evidence and argument. This provision became effective July 1, 1998.

court should also exclude any evidence where its probative value is substantially outweighed by its unfair prejudice. Tenn. R. Evid. 403. Finally, the prosecutor and the trial court should ensure that the prosecution's argument is restrained and reasoned, fairly based on the evidence, and not merely an appeal to the bias or emotional responses of the jury. Nesbit, ___ S.W.2d at ___.

Here, the victims' mothers testified during the penalty phase. Each related a few details about their deceased sons. Ms. Dawson testified that the shootings had a negative effect on her own life: she had divorced, moved to another house, and no longer knew what it was like to feel happy. Johnson's mother, Ms. Hudson, testified that "it had been hard to let go" of the killings, and she cried every day. She also testified that the killing affected her other two children, her father, and the victim's young daughter.

Although evidence regarding the emotional impact of the murder "should be most closely scrutinized," Nesbit, ___ S.W.2d at ___, nearly all of this evidence was limited in scope to a glimpse into the lives of Dawson and Johnson and the effects of the killings on their immediate families. This testimony was reserved in nature and not inflammatory, and its admission was not barred by the capital sentencing statutes or the Constitutions of the United States and Tennessee. Moreover, the prosecutor did not extensively discuss or emphasize this evidence in summation. Accordingly, neither the admission of this evidence nor the prosecution's argument was improper.

Ms. Dawson also testified, however, that the killings had adversely affected the entire community -- for instance, people were afraid and kept their doors locked. The prosecutor emphasized this testimony during closing:

> Do you remember the testimony of Miss Dawson? Stay home. Get back over here on David Street. Stay in your own driveway. Stay in your own yard. You'll be safe there. I never thought anybody would

come up in the yard. It reminds me of the old anonymous African proverb: It takes a whole village to raise a child. And that's what this village was. That's what David street was. This wasn't a street. You've heard it described here. This is the neighborhood we all wish America really had. And that was part of the impact evidence in this case. They didn't just kill a couple of more Memphis teenagers and try to kill a couple more. They killed an entire village. They killed an entire neighborhood. They destroyed the very backbone of this community when they do things like that. . . .

. . . .

You've heard what it did to this part of Orange Mound -- not just to families and not just to individuals, but what it did to Orange Mound.

This evidence and argument went beyond "information designed to show those unique characteristics which provide a glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon member's of the victim's family." Nesbit, ___ S.W.2d at ___ (footnote omitted)(emphasis added). The testimony was not objected to by the defendant, however, and the prosecutor's argument was based on this evidence. Although beyond the scope of Nesbit, neither the evidence nor the argument was inflammatory, and it did not render the proceedings fundamentally unfair or unduly prejudicial to the defendant. See Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Thus, we conclude the defendant is not entitled to relief on this issue.

## PROPORTIONALITY

A comparative proportionality review must be undertaken in capital cases pursuant to Tenn. Code Ann. § 39-13-206(c)(4) (1997). The analysis is designed to identify aberrant, arbitrary or capricious sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting, Pulley v. Harris, 465 U.S. 37, 42, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases

-13-

where the death penalty has been imposed," then the sentence is disproportionate. Bland, 958 S.W.2d at 668.

As we discussed in Bland, we have consistently employed the precedent seeking method of comparative proportionality review, which compares the case at issue with other cases in which defendants were convicted of the same or similar crimes. Since no crimes are precisely alike, the precedent seeking method of review is not a rigid, mechanical formula. Instead we consider numerous factors regarding the offense itself: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victims' age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Id. at 667. We also consider numerous factors about the defendant: (1) age, race and gender; (2) prior criminal record; (3) mental, emotional, or physical condition; (4) role in the murder; (5) remorse; (6) cooperation with authorities; (7) the defendant's knowledge of a victim's helplessness; and (8) the defendant's potential for rehabilitation. Id.

Here, the defendant shot the victim Dawson, walked around the side of the car, and then returned to shoot Dawson again. Acting in concert with others, the defendant shot and killed Dawson, shot and wounded Thomas, and shot at the fleeing Blackman. One apparent motivation for the killing was robbery; another, offered in the defendant's own statement, was to assist in a revenge scheme. There was no evidence to suggest the defendant was provoked or justified in his actions. The defendant's main argument with regard to the nature of the offense is that he did not know that the victims were unarmed.

The defendant was twenty-three years of age when the offense was committed. He had prior criminal convictions for burglary and theft. There is no

evidence that he suffered from any emotional, mental, or physical conditions. There is no evidence that the defendant showed remorse for these crimes or that he assisted the authorities; indeed, the proof shows that the defendant fled to Chicago after committing these crimes. The defendant played a major role in the commission of the crimes, killing Dawson, wounding Thomas, and firing at Blackman. There is extensive evidence of the defendant's religious faith and activities both before and after the offenses, but no other evidence as to his rehabilitative potential.

Our review reveals numerous cases similar to this one in which the death penalty was upheld. In Bland, supra, the defendant was convicted of premeditated murder for shooting an unresisting victim. As in this case, Bland and several co-defendants had planned to rob the victims. When one of the victims tried to flee, Bland shot him in the leg, pursued him a considerable distance, and then shot him several more times as the victim tried to hide under a truck. In addition to the similarities in how the killings occurred, Bland, age nineteen, was the same approximate age as Burns, and he had no prior adult criminal record. Also like the present case, only a single aggravating circumstance found by the jury -- that the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5).

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the defendant killed a seventy-four-year-old victim in the course of a robbery. The victim had been shot once and was lying on the floor when the defendant shot her in the head. The defendant was age nineteen and had no prior record. Mitigating evidence included the defendant's good work record, cooperation with law enforcement, remorse, and educational problems. The jury imposed the death sentence after finding only one aggravating circumstance -- that the "murder was especially heinous, atrocious, or

cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5).

In State v. McKay, 680 S.W.2d 447 (Tenn. 1984), co-defendants McKay and Sample were convicted of two counts of felony murder for shooting to death two store clerks in the course of a robbery. The defendants and victims were the same race, gender and approximate age. For Sample, the jury found three aggravating circumstances: great risk of death to two or more persons, murder was committed to prevent prosecution, and the killing occurred in the perpetration of a felony. Tenn. Code Ann. § 39-2-203(i)(3), (6), and (7) (1982) [now Tenn. Code Ann. § 39-13-204 (i)(3), (6), and (7)]. McKay had these same aggravators in addition to a prior conviction for a violent felony. Tenn. Code Ann. § 39-2-203(i)(2) (1982) [now Tenn. Code Ann. § 39-13-204(i)(2)]. See also State v. Johnson, 632 S.W.2d 542 (Tenn. 1982) (defendant and co-defendant shot three people during a robbery and shot and killed two people in the parking lot).

In State v. King, 694 S.W.2d 941 (Tenn.1985), the defendant and a co-defendant entered a tavern, fired a shot into the ceiling and ordered everyone to lie on the floor. After robbing each individual and taking money from the cash register, the defendant shot and killed the owner of the tavern. The defendant was convicted of felony murder and was sentenced to death based upon three aggravating circumstances: previous convictions for violent felonies; risk of death to two or more persons; and felony murder. Tenn. Code Ann. § 39-2-203(i)(2), (3), and (7) (1982) [now Tenn. Code Ann. § 39-13-204(i)(2), (3), and (7)].

In State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S. Ct. 328, 130 L. Ed. 2d 287 (1994), the defendant killed the victim by shooting him once in the head. The jury found the defendant guilty of premeditated murder and imposed the sentence of death upon finding that the murder was committed

-16-

while the defendant was engaged in committing a felony -- robbery. Tenn. Code Ann. § 39-2-203(i)(7) (1982) [now Tenn. Code Ann. § 39-13-204(i)(7)].

In State v. Cooper, 718 S.W.2d 256 (Tenn. 1986), cert. denied 479 U.S. 1101, 107 S. Ct. 1332, 94 L. Ed. 2d 183 (1987), the thirty-three-year-old defendant shot his estranged wife four time while she was trapped inside a cashier's booth. After shooting the victim once, he walked away, then turned back and resumed firing at her. The jury imposed the death penalty, as in this case, upon finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982) [now Tenn. Code Ann. § 39-13-204(i)(5)] .

These cases, although not identical, contain numerous similarities to both the offense and the defendant before us. In each case, the defendant shot and killed unarmed victims, with robbery being the apparent motive. In four of the cases, Bland, Van Tran, Hurley, and Cooper, the death penalty was imposed based upon a single aggravating circumstance found by the jury. In two of the cases, King and McKay, one of the aggravating circumstances was, as in this case, that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered. In two of the cases, Bland and Van Tran, mitigating circumstances included the youth of the offender and their minimal criminal records as adults. In all of these cases, this Court upheld the death penalty after finding that it was neither arbitrary nor disproportionate.

The defendant argues that unlike the defendants in these prior cases, he did not know that the victims were unarmed. He argues that the case is similar to State v. Jack Jay North, No. 02C01-9512-CC-00369 (Tenn. Crim. App., Jackson, Dec. 12, 1996), and State v. Horace Jones, No. 117 (Tenn. Crim. App., Jackson, Dec. 4,

-17-

1980) -- first-degree murder cases in which the defendants received sentences of life imprisonment.

In North, the defendant and a co-defendant entered the victim's home and shot the victim several times with a shotgun. The evidence showed that the killing was committed for the defendants to prove their worthiness to other members of a gang. In mitigation, North was only twenty years of age, had received a G.E.D, did not have a lengthy prior criminal record, and testified in a "tearful, emotional manner." The jury found three aggravating circumstances were proven but returned a verdict of life imprisonment.

In Jones, the defendant shot the victim several times in a pool hall. After the gun misfired and the defendant stopped to reload, the victim attempted to flee and was shot and killed. The defendant, who was twenty-four, was apprehended and arrested one month later. There was extensive mitigating evidence including the defendant's rehabilitative potential, extreme emotional disturbance, and threatening actions by the victim. The jury returned a life sentence for the offense.

Although not cited by the defendant or the State, we observe that the present case bears obvious similarities to Burns' co-defendants, Carlito Adams and Derrick Garrin, who were tried separately and received life sentences. Garrin had given a statement admitting he was present at the scene and fired shots at Blackman; but, he denied firing shots inside the car. State v. Derrick K. Garrin, No. 02C01-9501-CR-00028 (Tenn. Crim. App., Jackson, May 24, 1996). Adams testified that he and Blackman had a prior altercation in which Blackman pulled a gun. He admitted being at the scene but denied shooting anyone. In the sentencing phase, his family members and other witnesses testified about his employment history, character, and rehabilitative potential. His family members asked the jury to spare his life. State v.

<u>Carlito Adams</u>, No. 02C01-9608-CR-00267 (Tenn. Crim. App., Jackson, Dec. 11, 1997).

Despite these similarities to the present case, our function is not to invalidate a death sentence merely because the circumstances of the offense are similar to those in which another defendant or even a co-defendant received a life sentence. <u>See</u> <u>State v. Cauthern</u>, 967 S.W.2d 726 (Tenn. 1998) (defendant's death sentence not disproportionate merely because co-defendant received life sentence). Instead, we must review factors about the crimes and the defendant and, in comparing these factors with prior cases, determine whether the case plainly lacks circumstances found in similar cases in which the defendant received the death penalty. <u>Bland,</u> 957 S.W.2d at 687. Our review in this case reveals numerous comparable cases in which the death penalty was upheld. Thus, we conclude that the death sentence was not disproportionate or arbitrary as applied in this case.

## **CONCLUSION**

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death was not imposed arbitrarily or capriciously, that the evidence supports the jury's finding of the statutory aggravating circumstance, and that the evidence supports the jury's finding that the aggravating circumstance outweighed evidence of mitigating circumstances beyond a reasonable doubt.

We have reviewed all of the issues raised by the defendant and conclude that they are without merit. With respect to issues not specifically addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge John Peay and joined in by Judges Joe B. Jones and Joe Riley. Relevant portions of that opinion are attached as an appendix. The defendant's sentence of death by

electrocution is affirmed and shall be carried out on the 9th day of February, 1999, unless otherwise ordered by this Court or proper authority.

-20-

Costs of the appeal are taxed to the defendant, for which execution shall issue if necessary.

_____
RILEY ANDERSON, CHIEF JUSTICE

**CONCUR:**

Drowota, Birch, and Holder, JJ.