IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville December 9, 2014

**ANTONIO D. ALEXANDER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. 70558      Mitchell Keith Siskin, Judge**

---

**No. M2014-01022-CCA-R3-PC - Filed January 16, 2015**

---

Petitioner, Antonio D. Alexander, was convicted of first degree felony murder, second degree murder, especially aggravated kidnapping, especially aggravated robbery, attempted aggravated robbery, and reckless endangerment committed with a deadly weapon and sentenced to a total effective sentence of life without the possibility of parole plus 90 years. Petitioner's convictions and sentences were affirmed on appeal. *State v. Antonio D. Alexander*, No. M2010-02485-CCA-R3-CD, 2012 WL 1895801, at *1 (Tenn. Crim. App. May 23, 2012), *perm. app. denied* (Tenn. Sept. 20, 2012). Petitioner filed a petition for post-conviction relief, claiming that his right to due process was violated when the trial court failed to sequester the tentatively selected jury prior to the beginning of the trial and that he received ineffective assistance of counsel. The post-conviction court denied relief. Upon our review of the record and applicable authorities, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Joshua Crain, Murfreesboro, Tennessee, for the appellant, Antonio D. Alexander.

Herbert H,. Slatery III, Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

This case arises out of the 2008 robbery of an O'Charley's restaurant in Murfreesboro and the death of the on-duty manager. At midnight on February 2, 2008, Sean Mahoney was leaving his job as a bartender for O'Charley's when he was approached by Petitioner, who was wearing a ski mask and coveralls. *Antonio D. Alexander*, 2012 WL 1895801, at *1. Petitioner informed Mr. Mahoney that he was robbing him and brandished a .22 caliber pistol. *Id*. Petitioner then forced Mr. Mahoney out of his car and towards the back door of the restaurant. *Id*. Another employee, Michael Dorton, opened the door and Petitioner pointed the gun at him. *Id*. Mr. Mahoney and Mr. Dorton ran into the manager's office where their manager, Nadar Bahmanziari, was counting receipts; however, they were unable to completely close and lock the Dutch-style door. *Id*. Mr. Mahoney told Mr. Bahmanziari that Petitioner was robbing them, and Mr. Bahmanziari called 911. *Id*. at *2. Petitioner demanded that they open the door and give him the money. *Id*. Petitioner fired two shots; one shot did not penetrate the door, while the other went through the gap between the top and bottom sections of the door and struck Mr. Bahmanziari in the abdomen. *Id*. at *2, *6. Mr. Dorton pulled Mr. Bahmanziari into the office's closet and locked the door. *Id*. at *2. Then, Mr. Mahoney allowed Petitioner into the office, where he stole $2700 in cash before fleeing the scene. *Id*. Mr. Bahmanziari later died as a result of the gunshot wound to his abdomen. *Id*. at *6.

During the course of the investigation into the robbery, Mr. Mahoney, Mr. Dorton, and other employees of the O'Charley's gave the police a description of the perpetrator that matched Petitioner. *Id.* at *2. A van was discovered in the parking lot of the restaurant which did not belong to any of the employees. *Id*. at *3. The hood of the van was still warm, and inside the van was Petitioner's work identification badge, several pairs of gloves, earplugs, a stocking mask, and a wallet containing Petitioner's driver's license. *Id*. Pursuant to Petitioner's instructions, Petitioner's wife lied to the police and told them that she had left the van at the restaurant after becoming sick and had been picked up by a friend, Leon Moton. *Id*. at *3, *4.

Officers found a trail of money leading from a fence behind the restaurant to a house on North Maple Street which was undergoing renovations. *Id.* at *3. Inside the house were several footprints that matched one found near the fence. *Id*. Additionally, officers found a pair of dark coveralls, an earplug, and gloves of the same type as those provided by Petitioner's employer. *Id*. After the initial search of the house, a construction supervisor informed police that a loaded .22 caliber revolver was found in the top of a closet. *Id*. The coveralls and gun were positively identified by the O'Charley's employees as the

perpetrator's. *Id.* at \*4. The bullets recovered from the door and the victim had characteristics consistent with bullets fired from the .22 caliber revolver. *Id.* at \*5. Petitioner's DNA was found on the coveralls and gloves, and a partial DNA profile consistent with Petitioner was found on the earplug. *Id.*

On the morning of February 3, 2008, Petitioner called his girlfriend for help. *Id.* at \*4. She picked him up around 7:00 a.m. and took him to Mr. Moton's house, where Petitioner changed clothes. *Id.* Petitioner later asked his girlfriend to tell the police that he had been with her during the robbery, but she refused. *Id.* Petitioner asked Mr. Moton to tell his wife that Petitioner had been with him the previous night, and Mr. Moton agreed. *Id.* Later, Petitioner asked Mr. Moton to tell the police that he had picked up Petitioner's wife at the O'Charley's around 10:00 p.m. on February 2. *Id.* Mr. Moton later admitted to police that these statements were not true and told police that he had thrown Petitioner's clothes into the dumpster across the street from his house. *Id.* at \*5. Petitioner's DNA was found on the pants and shoes recovered from the dumpster. *Id.* The shoes also matched the footprints found in the house on North Maple Street. *Id.*

Petitioner was convicted by a Rutherford County jury of first degree felony murder, second degree murder, especially aggravated kidnapping, especially aggravated robbery, attempted aggravated robbery, and reckless endangerment committed with a deadly weapon. *Id.* at \*1. The jury sentenced Petitioner to life without the possibility of parole for the first degree felony murder conviction, and the trial court sentenced him to a consecutive ninety-year sentence for the remaining offenses.[1] *Id.* Petitioner's convictions and sentences were affirmed on appeal. *Id.*

On September 6, 2013, Petitioner filed a timely pro se petition for post-conviction relief. Counsel was appointed, and an amended petition was filed on February 26, 2014. Petitioner claimed that, even though the jury was sequestered during trial, the trial court erred by allowing the jury to separate over the weekend after they were selected but before the trial began. Petitioner also claimed that he received ineffective assistance of counsel when his trial attorney did not object to the jury's separation. The post-conviction court held a hearing on May 2, 2014, at which both Petitioner and trial counsel testified.

Petitioner testified that he did not have an active role in the jury selection process because his attorneys told him to just sit and observe the proceedings. Jury selection took several days, and Petitioner testified that he believed the jury would be sequestered immediately after the selection process. When jury selection concluded on Thursday, however, the trial court allowed the tentatively selected jurors to return home until the trial

---

[1]The second degree murder conviction merged with the first degree felony murder conviction.

began on the following Monday so that they would not have to stay in a motel an extra weekend. Petitioner testified that he raised his concern about the jury being allowed to separate to his attorneys, but his attorneys did not raise the issue with the trial court. Petitioner agreed that he did not address the issue when the trial actually began and that he did not raise the issue after the trial because he was not "aware" that a jury sequestration issue had occurred. Petitioner testified that trial counsel never showed him the issues being raised on appeal; rather, trial counsel told him there "would be an automatic appeal." On cross-examination, Petitioner agreed that the trial court gave very specific instructions to the jury before they were allowed to separate over the weekend.

Petitioner also raised an issue concerning a juror bringing a newspaper into the courtroom during the trial. Counsel for Petitioner informed the post-conviction court that he had investigated the issue and could not find any evidence either in the record or from interviewing former jurors that the incident occurred. Petitioner explained to the post-conviction court that upon returning from a break in the trial, a juror had a newspaper tucked under her arm. The trial judge noticed it and questioned the juror about it. The juror did not realize she had done anything wrong, and, after determining that nothing in the paper referenced Petitioner's case, the trial court did not remove the juror from the jury. Petitioner claimed that when the trial court asked the jury who had read the paper, "there was a show of hands." Petitioner explained that he was concerned about this incident because "the jury defied what the [j]udge instructed, who is to say that they hadn't done [the same] throughout the course of the trial." Trial counsel did not object, and the trial court did not declare a mistrial. Petitioner admitted that he did not address this issue with trial counsel.

Trial counsel testified that he was one of two attorneys representing Petitioner in his capital case. Trial counsel met with Petitioner several times to discuss the case and also discussed all motions with Petitioner. Trial counsel did not believe that he and Petitioner had any trouble during the course of the representation. Trial counsel testified that there was a bit of a difference in opinion as to how to proceed in the case, but trial counsel took Petitioner's concerns into account and made sure Petitioner was involved in decisions regarding trial strategy. Trial counsel denied ever telling Petitioner not to communicate with him regarding his concerns or not to participate in the trial.

Regarding the jury sequestration issue, trial counsel recalled that the trial court sent the jury home over the weekend after they were tentatively selected. The jury had not been sworn in at that time. The trial court gave the jury instructions regarding the role of the jury inside and outside of the courtroom. When the jury returned for the start of the trial, the trial court administered the oath. Trial counsel testified that he was not concerned about the trial court's actions because it was consistent with the law. Trial counsel did not raise an objection and did not raise the issue on appeal because it was not a viable issue.

On cross-examination, trial counsel explained that the voir dire took at least a week. On each night of the voir dire, the individuals went home knowing what the case was about and the issues that would likely come up at trial. Trial counsel testified that he was not any more concerned about the trial court allowing the tentatively selected jurors to go home over the weekend than he had been about the voir dire panel going home each evening.

The post-conviction court orally denied the petition at the conclusion of the hearing, then filed a written order on May 7, 2014. The post-conviction court found that the trial court had followed the sequestration rules and that the trial court had the discretion to allow the tentatively selected jurors to return to their homes prior to the start of the trial as long as the trial court gave the proper admonitions. The post-conviction court found that the claimed incident with the newspaper was not substantiated by the record and that Petitioner had not proven a constitutional violation by clear and convincing evidence. The post-conviction court also found that trial counsel's performance did not fall below the prevailing professional norm when he failed to object to the trial court's decision not to sequester the tentatively selected jury prior to the start of trial.

Petitioner filed a timely notice of appeal.

*Analysis*

*I. Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, this Court gives deference to the post-conviction court's findings as to witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence. *Momon*, 18 S.W.3d at 156 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented below and is bound by the findings of the post-conviction court unless the evidence preponderates otherwise. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). However, the post-conviction court's conclusions of law and application of the law to the facts are subject to de novo review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

"In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." T.C.A. § 40-18-116. Sequestration is mandatory in capital cases. *State v. Bondurant*, 4 S.W.3d 662, 672 (Tenn. 1999). The purpose of sequestration is "to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial." *Id*. at 671. However, the trial judge has the discretion to allow separation of tentatively selected jurors prior to the time the jurors are sworn, so long as appropriate admonitions are given. *State v. McKay*, 680 S.W.2d 447, 453 (Tenn. 1984). When such a separation occurs, "it is not grounds for reversal or a new trial unless it can be affirmatively shown that prejudice resulted from the separation." *Id.*

In this case, jury selection occurred over the course of several days, concluding on a Thursday. Due to evidentiary motions, the trial would not begin until the following Monday. The trial court announced that it did not want the jurors to spend an extra weekend under sequestration and allowed the tentatively selected jurors to go home. The trial court admonished the jury not to discuss the case with anyone and not to watch television, read the newspaper, listen to the radio, or do any internet research on the case. The trial court did not place the jurors under oath until the trial began on Monday. The decision to allow the tentatively selected jurors to separate prior to being sworn was properly within the trial court's discretion. *McKay*, 680 S.W.2d at 453; *see also State v. Black*, 815 S.W.2d 166, 180 (Tenn. 1991) (finding no abuse of discretion on nearly identical facts).

Petitioner erroneously relies on *Hines v. State*, 27 Tenn. 597, 602 (1848), for the proposition that, upon proof that a jury separation has occurred, the defendant is entitled to a new trial unless the State can affirmatively show there was no prejudice. However, in *McKay*, our supreme court specifically overruled *Hines* "insofar as [it] appl[ies] the rule stated therein to prospective and tentatively selected jurors." *McKay*, 680 S.W.2d at 453. As the supreme court explained:

> Until the jury panel has been sworn to try a case, the court may, for any good cause, discharge a juror who has been tentatively selected and proceed with selection of another juror in his or her place. Thus, both the State and the defendant have the opportunity to affirmatively show that a tentatively selected juror has been tampered with or that some prejudice has resulted from a separation prior to swearing and sequestration.

*Id*. Petitioner failed to make any showing of jury tampering or prejudice that resulted from the pre-trial separation. Therefore, Petitioner cannot prove a constitutional due process violation, and this issue is without merit.

*Ineffective Assistance of Counsel*

Both the Sixth Amendment to the Constitution of the United States and Article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *Burns*, 6 S.W.3d at 461. In order to receive post-conviction relief based on a claim of ineffective assistance of counsel, a petitioner must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

To establish deficient performance, a petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. Counsel's performance is considered reasonable "if the advice given or the services rendered [were] within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). This Court "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. A petitioner is not entitled to the benefit of hindsight to second-guess a reasonably based trial strategy or a sound, but unsuccessful, tactical decision. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

Petitioner contends that he is entitled to relief because trial counsel should have objected to the trial court's allowing the tentatively selected jury to separate prior to being sworn. Trial counsel testified that he did not object or raise the issue on appeal because the trial court's actions were consistent with the law and because it was not a viable issue. As discussed above, the trial court's actions were consistent with established precedent. Because the trial court did not err, it was not error for trial counsel to refrain from raising a meritless objection. Therefore, trial counsel's performance was not deficient. Additionally, Petitioner failed to assert any type of prejudice resulting from trial counsel's actions.

-7-

Therefore, Petitioner is not entitled to relief.

*Conclusion*

Based on the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
TIMOTHY L. EASTER, JUDGE